**PLANNED PARENTHOOD OF IDAHO, INC.; Glenn H. Weyhrich, M.D., Plaintiffs–Appellants,**

v.

**Lawrence WASDEN,\* Attorney General of the State of Idaho; Greg Bower, Ada County Prosecuting Attorney, Defendants–Appellees.**

**Planned Parenthood of Idaho, Inc.; Glenn H. Weyhrich, M.D., Plaintiffs–Appellees,**

v.

**Lawrence Wasden,\* Attorney General of the State of Idaho; Greg Bower, Ada County Prosecuting Attorney, Defendants–Appellants.**

Nos. 02–35700, 02–35714.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2003.

Filed July 16, 2004.

---

\* Lawrence Wasden is substituted for his predecessor, Alan G. Lance, as Attorney General of the State of Idaho. Fed. R.App. P. 43(c)(2).

Helene T. Krasnoff, Planned Parenthood Federation of America, Washington, DC, for the plaintiffs-appellants-cross-appellees.

Clinton E. Minor, Deputy Attorney General and Jeremy Chou, Deputy Attorney General, State of Idaho, Boise, ID; Scott J. Smith, Racine, Olson, Nye, Budge & Bailey, Pocatello, ID, for the defendants-appellees-cross-appellants.

William T. Sali, Kuna, ID, for the amici-curiae.

A. Stephen Hut, Jr., Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, for amici-curiae Society for Adolescent Medicine, American Public Health Ass'n and Physicians for Reproductive Choice and Health.

Before HAWKINS, McKEOWN, and BERZON, Circuit Judges.

BERZON, Circuit Judge:

These appeals concern Idaho's law governing minors' access to abortion services. We conclude that the statute's definition of "medical emergency" is unconstitutionally narrow, and that, without an adequate medical exception, the parental consent statute is invalid.

# I. BACKGROUND

## A. The Statutes

The statutes at issue are 2000 Idaho Session Laws 7, Senate Bill No. 1299, and 2001 Idaho Session Laws 277, House Bill No. 340 (together, the "parental consent statute"), which together replaced, amended, or added sections 9–340G, 18–602, 18–604, 18–605, 18–608A, 18–609, 18–609A, 18–614, and 18–615 to the Idaho Code.[1] Although the instant suit challenges only sections 18–605, 18–609A, and 18–614, an outline of the overall statutory scheme aids in evaluating the legal issues before us:

Section 18–602 sets forth legislative findings supporting the remainder of the statute; section 18–604 defines various terms used in the statute.

Section 18–605 establishes civil and criminal penalties for persons who perform abortions other than as permitted by the remainder of title 18, chapter 6 of the Idaho Code.

Section 18–609A specifies special consent prerequisites to performing an abortion upon a minor. The law requires either written, informed consent from the minor and her parent; written, informed consent from the minor along with proof of her emancipation; a court order; or the presence of an urgent medical emergency. Idaho Code § 18–609A(1)(a).

An abortion may be performed pursuant to the medical emergency provision only if the attending physician certifies the existence, in his medical judgment, of an emergency so urgent as to require performance of the abortion sooner than parental consent or a court order could be obtained. If an emergency abortion has been performed, the operating physician must pro-

---

1. Sections 18–605, 18–609A, 18–614, and 18–615, as amended by the 2001 law, are set forth in the Appendix.

vide immediate notice to the minor's parent. If immediate notice is not possible, the physician must take responsibility for the minor's postoperative care, diligently attempt to notify her parent, and eventually provide actual notice to her parent that the abortion was performed and why. Should the physician believe notification of a parent would endanger the minor, or if the minor is homeless or abandoned, he can discharge his duty by making a report to law enforcement to that effect. *Id.* § 18–609A(1)(a)(v).

The term "medical emergency," central to our decision in this case, is defined as follows:

(i) "Medical emergency" means a sudden and unexpected physical condition which, in the reasonable medical judgment of any ordinarily prudent physician acting under the circumstances and conditions then existing, is abnormal and so complicates the medical condition of the pregnant minor as to necessitate the immediate causing or performing of an abortion:

1. To prevent her death; or

2. Because a delay in causing or performing an abortion will create serious risk of immediate, substantial and irreversible impairment of a major physical bodily function of the patient.

(ii) The term "medical emergency" does not include:

1. Any physical condition that would be expected to occur in normal pregnancies of women of similar age, physical condition and gestation; or

2. Any condition that is predominantly psychological or psychiatric in nature.

*Id.* § 18–609A(5)(c).

Section 18–609A(1)(b) specifies how a minor may bypass the parental consent requirement: The minor may file a bypass petition in the county of her residence or in the one in which the abortion is to be performed. The minor may assert in her petition either that she is sufficiently mature to provide her own consent to the procedure or that, notwithstanding her lack of maturity, the procedure would be in her best interest. If the minor requests aid in completing the petition, Idaho must provide it, through a guardian ad litem (who must be an attorney) or through some other person. *Id.* § 18–609A(1)(b)(i) & (ii).

At a hearing on the petition, the minor may be assisted by a guardian ad litem. If no attorney is available to fill that role, the court may appoint a nonattorney. *Id.* § 18–609A(1)(b)(iii). After holding a hearing, at which the court may hear any relevant evidence, the court must, within five days, determine whether the minor has shown sufficient maturity to be allowed to choose to end her pregnancy; whether, notwithstanding her failure to make that showing, an abortion would nonetheless be in her best interests; or whether neither of these circumstances obtains and the petition should be denied. *Id.* § 18–609A(1)(b)(iv). The five-day deadline can be delayed should the minor so request or for "other good cause." *Id.* § 18–609A(1)(d). The minor may within two days appeal an order denying her petition; the appeal is to receive expedited attention. *Id.* § 18–609A(1)(c).

The court hearing the petition is obligated to order an "investigation" if the evidence it receives in hearing the petition makes it aware of facts that would, if true, constitute a criminal offense under Idaho law or a violation of Idaho child-protection laws, "with due consideration for the confidentiality of the [bypass] proceedings." *Id.* § 18–609A(1)(b)(iv). A bypass peti-

tioner's statements at the bypass hearing will generally be inadmissible against her in any criminal prosecution arising from the investigation triggered by her bypass hearing. *Id.*

Physicians accused of violating section 18–609A have an affirmative defense to prosecution if, prior to the procedure, they obtained identification from the woman seeking the abortion that a reasonable person would take to prove she was either emancipated or of the age of majority. *Id.* § 18–614(1). If the abortion was performed due to a medical emergency, the physician may obtain the identification after performing the abortion, and may claim the defense so long as he is unable to determine her age "after reasonable inquiry." *Id.* § 18–614(3).[2]

Finally, section 18–615 provides a severability clause, asserting that the legislature "would have passed every section . . . and each provision, section, subsection, sentence, clause, phrase or word" regardless of the invalidation of any other part of the statute.

## B. The Litigation

This case began in June 2000, when Glenn H. Weyhrich, M.D., a Boise obstetrician-gynecologist, and Planned Parenthood of Idaho, Inc. ("Planned Parenthood"), a not-for-profit medical and educational service that does not perform abortions, filed suit challenging the then-new parental consent statute. The complaint sought to enjoin the defendants—the Idaho attorney general and the district attorney for Ada

County, where Boise is located—from enforcing the entirety of the 2000 Act.[3] The complaint challenged as facially unconstitutional the identification requirement contained in section 18–614, as enacted by the 2000 Act; the judicial bypass provision; the post-emergency-abortion parental notification requirement; and certain features of the criminal liability to which physicians were exposed. The district court preliminarily enjoined the enforcement of (1) the identification requirement; (2) the felony provisions, in any prosecution arising from an alleged medical emergency; and (3) the venue provision of the judicial bypass procedure, which under the 2000 Act allowed a minor to file a petition only in her home county.

In response to the preliminary injunction in this case, the Idaho legislature enacted the 2001 Act. That Act, as relevant here, revised the felony provision; replaced the affirmative-identification requirement with the affirmative defense, described above; and expanded the venue provision to allow a bypass petition to be filed either in the minor's home county or in the county in which the procedure would be performed.

The plaintiffs' amended complaint, as revised to reflect the 2001 amendments, charged that the Idaho regime (1) provides an inadequate judicial bypass to the parental consent requirement (section 18–609A(1)(a)(iv) & (b)-(d)); (2) insufficiently provides for access to abortion where a minor woman's life or health is threatened by her pregnancy (section 18–609A(1)(a)(v)

2. As originally enacted in 2000, section 18–614 instead required that any woman seeking abortion (other than a minor who has obtained a judicial bypass) provide identification to her physician. The 2001 Act replaced that requirement with the affirmative-defense regime described in the text.

3. The defendants were sued under 42 U.S.C. § 1983, via the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Because the true party in interest is the state of Idaho, we will refer to the defendants as though they were identical to the state. *See generally Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 846–48 (9th Cir.2002).

& (5)(c)); (3) improperly requires parental notification after an emergency abortion (section 18–609A(1)(a)(v)); and (4) is unconstitutionally vague in defining the civil and criminal liability to which abortion providers are subject (sections 18–605 & 18–614). The plaintiffs prayed for declaratory and injunctive relief against sections 18–605, 18–609A, and 18–614, as revised by the 2001 Act, and sought preliminary relief. The district court preliminarily enjoined only the new venue provision.

After a trial in which the district court heard testimony from a number of physicians and other experts, the district court granted the plaintiffs partial permanent relief as follows: *Judicial bypass.* The court held the venue rule impermissibly burdensome, in light of Idaho's admission that the state had "no interest" that limiting venue would serve. Applying *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (*Bellotti II* ), the court also invalidated the requirement that a petitioner file her notice of appeal of a court's denial of her bypass petition within two days of its issuance, Idaho Code § 18–609A(1)(c), as the minor might well not receive the ruling (by mail) in time to file a timely notice.

The court also invalidated the mandatory-reporting requirement of section 18–609A(1)(b)(4). Under Idaho law, *any* impregnation of an unmarried, unemancipated minor will necessarily have resulted from a crime. *See* Idaho Code § 18–6101(1) (defining rape to include any intercourse with a "female . . . under the age of eighteen"). The plaintiffs' argument, which the district court accepted, was that the near-certainty that a bypass proceeding would result in a criminal investigation of the minor's sex partner would compromise the confidentiality of the bypass proceedings and so would unconstitutionally chill minors' willingness to use the bypass procedure.

*Medical emergency.* The plaintiffs challenged section 18–609A(5)(c)'s definition of an emergency as "a sudden and unexpected physical condition which . . . is abnormal and so complicates the medical condition of the pregnant minor as to necessitate the immediate causing or performing of an abortion." They argued that the subsection unconstitutionally precludes invocation of the emergency exception by minors with conditions that, while medically necessitating an abortion, were not sudden, unexpected, *and* abnormal. The district court rejected this argument, holding that "sudden" refers to the moment of diagnosis of the condition, not the condition itself; "unexpected" to the physician's inability to know precisely when the medical condition would become acutely emergent; and "abnormal" to the fact that in an ordinary pregnancy there is no need for an abortion. As thus interpreted, concluded the district court, the statute is no more restrictive than the medical emergency provision upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 880, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). On this basis, the court upheld the emergency provision in its entirety. The district court also rejected the plaintiffs' alternative argument that the medical emergency provision was unconstitutionally vague.

*Post-emergency notification.* The district court invalidated the post-emergency notification provision in its entirety as an infringement of the minor's right to confidentiality. It held that even the provision allowing physicians to report to law enforcement rather than the minor's parents in limited circumstances would ultimately lead to an infringement of the minor's right to confidentiality, and that non-abused as well as abused minors have a

constitutional right to avoid notification of their parents in some circumstances.

*Physician liability.* The court upheld sections 18–605, 18–614, and the other provisions related to civil and criminal liability for those who perform unlawful abortions. Although recognizing that the statutory regime was "not a model of clarity," the court found that section 18–605(3)'s scienter requirement ensured that the statute was sufficiently definite to be enforced lawfully.

*Severability.* Finally, the district court, applying Idaho severability law and the statute's severability clause, found that the invalid provisions were severable and that the remainder of title 18, chapter 6 of the Idaho Code could be upheld not-withstanding the invalidity of some parts of 18–609A.

Consistent with these rulings, the final judgment of the district court permanently enjoined the enforcement of (1) the first sentence of section 18–609A(1)(b)(i); (2) the first sentence of section 18–609A(1)(c); (3) the final paragraph of section 18–609A(1)(b)(iv); and (4) all but the first sentence of section 18–609A(1)(a)(v), leaving the remainder of the statute in place. The plaintiffs appealed, seeking the relief the district court denied them, and the defendants cross-appealed the injunction, except with respect to the two-day notice-of-appeal requirement. With that one exception, we are therefore presented with all the issues that were before the district court.[4]

## II. DISCUSSION

### A. Challenges to the Parties

As a threshold matter, the state raises several issues concerning whether this suit can go forward at all, or can go forward only in a truncated form, because the parties are not properly before the court. The contentions are: (1) neither plaintiff has standing to challenge the statute; (2) one of the two defendants, Idaho's attorney general, is not a proper defendant to any claim because he does not enforce the challenged law; and (3) the other defendant, the Ada County prosecutor, is not involved in the administration of the judicial bypass provision and so is only properly a defendant for some of the claims. The district court held that Weyhrich had standing to challenge the entire statute; that, because Weyhrich had standing, there was no need to decide Planned Parenthood's right to sue; and that both defendants were proper. We review those determinations *de novo*. *Gospel Missions of Am. v. City of Los Angeles,* 328 F.3d 548, 553 (9th Cir.2003).

### 1. Dr. Weyhrich

A plaintiff has standing to sue under Article III of the Constitution only when he can allege (1) an "actual or imminent," "concrete and particularized" "injury in fact," (2) causally connected to the defendants' conduct, that (3) will "likely" (and not "merely speculative[ly]") be redressed by a favorable judgment. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Weyhrich has stated his clear intention to continue to perform abortions for his patients, of whom some are minors. He has alleged a sufficiently concrete and imminent injury—possible prosecution and imprisonment—to challenge the provisions that ban abortion providers from performing abortions on minors except in accord

4. We shall refer throughout to the plaintiffs as such or by name and to the defendants as "the state" or "Idaho."

with the statutory requirements. *See Diamond v. Charles,* 476 U.S. 54, 65, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) ("A physician has standing to challenge an abortion law that poses for him a threat of criminal prosecution."). Whether he continues to perform abortions subject to the statute, desists from performing them to avoid the statute's penalties, or violates the statute so as to practice his profession in accord with his medical judgment, his liberty will be concretely affected. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." (internal quotation marks omitted)); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (stating that abortion providers "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"). Weyhrich need not claim a specific intent *to violate* the statute. *See California Pro–Life Council, Inc. v. Getman,* 328 F.3d 1088, 1094–95 (9th Cir.2003) (allowing a challenge where plaintiff had a reasonable fear a statute would be enforced against it *if* it engaged in certain conduct).

Weyhrich's potential punishment for violating the parental consent statute extends to all of the challenged provisions. As his complaint notes, should any aspect of the bypass provisions, including those not on their face directed toward physicians, prevent or chill a minor from seeking an abortion she would otherwise seek, she will not seek his care. By discouraging potential patients from engaging his services, these provisions could result in a primary injury to Weyhrich. For example, should a minor desiring an abortion decline to seek a bypass for fear that her boyfriend will be sent to prison if a judge learns that the boyfriend impregnated her, she may

never consult Weyhrich and never obtain a procedure Weyhrich would recommend as medically indicated. Weyhrich's own interests, both financial and professional, in practicing medicine pursuant to his best medical judgment, are thus affected by a statutory provision that he alleges violates the federal constitutional rights of potential abortion patients. Such a threatened injury in fact is neither speculative nor inchoate. Weyhrich therefore has Article III standing to raise each of his challenges.

As a prudential matter, even when a plaintiff has Article III standing, we ordinarily do not allow third parties to litigate on the basis of the rights of others. *See Coalition of Clergy, Lawyers, & Professors v. Bush,* 310 F.3d 1153, 1163 (9th Cir. 2002), *cert. denied,* 538 U.S. 1031, 123 S.Ct. 2073, 155 L.Ed.2d 1060 (2003). Since at least *Singleton v. Wulff,* however, it has been held repeatedly that physicians may acquire *jus tertii* standing to assert their patients' due process rights in facial challenges to abortion laws. 428 U.S. 106, 117–18, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (plurality opinion) ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision . . . ."); *cf. Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (allowing physician to assert privacy rights of patients because of the confidential nature of the relationship and because the rights of the latter were "likely to be diluted or adversely affected" if they could not be asserted by the physician). Indeed, physicians and clinics performing abortions are routinely recognized as having standing to bring broad facial challenges to abortion statutes. *See, e.g., City of Akron v. Akron Ctr. for Reprod. Health,* 462 U.S. 416, 440 n. 30, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983)

(*Akron I* ), *overruled on other grounds by Casey*, 505 U.S. at 882, 112 S.Ct. 2791; *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 & n. 2, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Planned Parenthood of S. Ariz. v. Lawall*, 180. F.3d 1022, *amended by* 193 F.3d 1042 (9th Cir.1999). We may therefore consider the constitutional arguments Weyhrich raises solely on his patients' behalf. *See Singleton*, 428 U.S. at 117, 96 S.Ct. 2868; *Akron I*, 462 U.S. at 440 n. 30, 103 S.Ct. 2481.[5]

### 2. Planned Parenthood

Planned Parenthood's standing poses different questions. Unlike Planned Parenthood affiliates in several other states who have been found to have standing to challenge abortion regulations, *see, e.g., Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 465 (7th Cir.1998), the Idaho chapter does not provide abortion services directly. Instead, the Idaho chapter provides only counseling, contraceptive, and referral services.

Idaho contends that Planned Parenthood therefore lacks standing. Unlike Weyhrich, Planned Parenthood's conduct is not threatened by enforcement of the statute, and it can, under Idaho law, have no abortion "patients" whose interests it may espouse. If Planned Parenthood can enunciate no more than an "ideological" interest in seeing the statute invalidated, it lacks standing to challenge it. *Id.*

On appeal, Planned Parenthood articulates no independent theory for its standing. It instead piggybacks on Weyhrich, defending the district court's conclusion that because Planned Parenthood shares an attorney with Weyhrich, its presence in the suit poses no threat of enhanced legal fees, and that because Weyhrich has standing, we need not decide whether Planned Parenthood may maintain this suit.

■ ■ We agree that there is no reason to address Planned Parenthood's standing. Where the legal issues on appeal are fairly raised by "one plaintiff [who] had standing to bring the suit, the court need not consider the standing of the other plaintiffs." *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1086 (9th Cir.2003) (citing and explaining *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981), and *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 & n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1369 (9th Cir.1992); *see also Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147 n. 10 (3d Cir. 2000). As our jurisdiction and our duty to answer the questions raised here would be unaffected by the resolution of Idaho's challenge to Planned Parenthood's standing, we decline to decide the issue.[6]

**5.** To the extent that it persists in challenging Weyhrich's standing to challenge the parts of the statute subjecting him to potential liability, Idaho maintains that because he has no antecedent constitutional *right* to perform abortions, its new regulation of the manner in which he may engage in that conduct causes him no injury. This argument misunderstands the standing doctrine. Weyhrich suffers an injury *in fact* sufficient for Article III standing purposes from the impact of the statute on his practice of his profession. Whether he is entitled to relief from the oper-

ation of the statute on the ground of constitutional invalidity is a distinct question of prudential standing, as just discussed.

**6.** We note, however, that on remand, when the district court enters the appropriate injunctive relief against enforcement of the statute, it may need to decide whether Planned Parenthood is a proper plaintiff. Only a proper party to an action can enforce an injunction that results from a final judgment. *See* Fed.R.Civ.P. 65(d) ("Every order granting an injunction ... is binding only upon the

### 3. The Attorney General and County Prosecutor

The Idaho attorney general denies having authority to enforce any part of the statute. The Ada County prosecutor acknowledges, correctly, that he is a proper defendant with regard to those provisions creating the potential for prosecution, see Idaho Code § 31–2604(2) (2003), but denies any involvement in judicial bypass proceedings or the administrative penalties that the Idaho Board of Medicine can impose under section 18–605(2).

Whether these officials are, in their official capacities, proper defendants in the suit is really the common denominator of two separate inquiries: first, whether there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress, see Lujan, 504 U.S. at 560, 112 S.Ct. 2130; Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); and second, whether our jurisdiction over the defendants is proper under the doctrine of Ex parte Young, 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which requires "some connection" between a named state officer and enforcement of a challenged state law. See Los Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 704 (9th Cir.1992). "This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." Id.

■ State attorneys general are not invariably proper defendants in challenges to state criminal laws. Where an attorney general cannot direct, in a binding fashion, the prosecutorial activities of the officers who actually enforce the law or bring his own prosecution, he may not be a proper defendant. See, e.g., Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir.1992) (doubting that the "general supervisory powers" of the California attorney general present a sufficient connection to the enforcement of a search and seizure statute); S. Pac. Transp. Co. v. Brown, 651 F.2d 613, 614 (9th Cir.1980) (holding that the Oregon attorney general, who had the power to "consult with, advise, and direct the district attorneys," had an insufficient connection to the challenged statute, because his advice to prosecutors that the statute was unconstitutional could not bind them and he could not bring a prosecution on his own).

■ Under Idaho law, the attorney general may "assist" county prosecutors in a "collaborative effort," but may not "assert[ ] dominion and control" over prosecutions against the county prosecutor's wishes. Newman v. Lance, 129 Idaho 98, 922 P.2d 395, 399–401 (1996); see also Idaho Code § 67–1401(7).[7] Idaho's governor may also direct the attorney general to assist a local prosecutor. Id. § 67–802(7).

---

parties to the action ... and upon those persons in active concert or participation with them and who receive actual notice of the order...."); Doe v. County of Montgomery, Ill., 41 F.3d 1156, 1161–62 (7th Cir.1994) (upholding the standing of two plaintiffs while affirming the district court's dismissal of the third plaintiff's complaint for lack of standing).

**7.** After Newman, section 67–1401 was amended by the Idaho legislature. A provision that previously allowed the attorney general to "exercise supervisory powers over prosecuting attorneys in all matters pertaining to the duties of their offices" was repealed, leaving only the provision that, "[w]hen required by the public service, [he is] to repair to any county in the state and assist the prosecuting attorney thereof in the discharge of duties." Idaho Code § 67–1401(6) (1997); Idaho Code § 67–1401(7) (2003). The statement of purpose in the bill effecting the change indicated

However, and determinatively here, unless the county prosecutor objects, "[t]he attorney general may, in his assistance, *do every act* that the county attorney can perform." *Newman,* 922 P.2d at 399 (quoting *State v. Taylor,* 59 Idaho 724, 87 P.2d 454, 457 (1939)) (emphasis added).[8] That is, the attorney general may in effect deputize himself (or be deputized by the governor) to stand in the role of a county prosecutor, and in that role exercise the same power to enforce the statute the prosecutor would have. That power demonstrates the requisite causal connection for standing purposes. An injunction against the attorney general could redress plaintiffs' alleged injuries, just as an injunction against the Ada County prosecutor could. For the same reasons, both defendants are properly named under *Ex parte Young* with regard to the exposure to the risk of prosecution created by section 18–605, for noncompliance with the parental consent provisions of section 18–609A.

In the circumstances of this case, we need not decide whether the two are proper defendants for each and every claim appellants make, because, under our ensuing analysis, a defect involving the parental consent provisions is fatal to the entire statute. Having decided that the suit by Weyhrich against the county prosecutor and the attorney general presents a justiciable case or controversy regarding the outcome-determinative facet of the statute, we turn to the merits now.

## B. Scope and Standard of Review

■■■ The constitutionality of a state statute is a question of law, which we review *de novo. Delano Farms Co. v. Cal. Table Grape Comm'n,* 318 F.3d 895, 897 (9th Cir.2003). Facial challenges to state statutes are usually guided by the rule of *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), which requires "the challenger [to] establish that no set of circumstances exists under which the Act would be valid." That rule gives way, however, in at least two circumstances: the First Amendment doctrine of overbreadth and the constitutional standards applicable to abortion cases. *See Planned Parenthood of S. Ariz. v. Lawall,* 180 F.3d 1022, 1025, *amended by* 193 F.3d 1042 (9th Cir.1999) (*Lawall I* ).[9]

*Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 895, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992),

it was meant to codify, not to override, *Newman. See* 1998 Idaho Sess. Laws 245. The Idaho Supreme Court has nonetheless mentioned, in dicta, that the elimination of the "supervisory" provision "apparently reduc[ed] the authority of the Attorney General in relation to county prosecuting attorneys" as compared with the pre-*Newman* statute. *State v. Summer,* 139 Idaho 219, 76 P.3d 963, 968 (2003). Because our decision on standing relies only on the "assistance" powers the attorney general explicitly retains under revised section 67–1401(7), we need not determine whether the amendments to section 67–1401 affect the holding in *Newman.*

8. Although *Newman* describes a longer passage of *Taylor* from which this phrase is taken as dictum, 922 P.2d at 399, it does so in the course of dismissing an argument regarding the breadth of the attorney general's *supervisory* power. The statement regarding his powers of assistance was not itself rejected in *Newman,* is consistent with the holding in *Newman* and with the current version of the statute, and is at least a fair indication of how the Idaho Supreme Court would rule on the question before us. *See United States v. Colin,* 314 F.3d 439, 443 (9th Cir.2002) (noting that our task in interpreting state law is to predict how the state's highest court would decide the question).

9. A majority of the circuits now agree that *Casey* effectively precludes the application of *Salerno* in abortion cases, although the Fourth and Fifth Circuits, along with some of the dissenting justices in *Casey,* do not. *See*

held that a facial challenge to an abortion statute will succeed where, "in a *large fraction* of the cases in which [the statute] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion" (emphasis added). That is, the fact that the statute is susceptible to *some* constitutional application will not save it from facial attack. Rather, we must be satisfied that it will pose an undue burden in only a small fraction of relevant cases. *See Tucson Woman's Clinic v. Eden*, 371 F.3d 1173 (9th Cir. June 18, 2004) (elaborating the application of *Casey* in facial challenges). The relevant "large fraction" is in turn to be computed with reference only to "the group for whom the law is a restriction, not the group for whom the law is irrelevant," *i.e.*, those upon whom a challenged law would have some actual effect, rather than all women, or all minors, seeking an abortion. *Id.* at 894, 112 S.Ct. 2791.[10]

### 1. The Statute

#### a. Minors' Access to Abortion

Our approach to abortion regulation is directed by a number of guideposts set down in the Supreme Court's cases on the subject, beginning with *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and continuing through the Court's most recent abortion ruling, *Stenberg v. Carhart*, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Following the trajectory set by those cases, we conclude that Idaho's parental consent statute does not provide an adequate exception to the requirements that can impose a time delay upon a minor whose life or health depends on quick termination of her pregnancy.

Adult women have a Fourteenth Amendment right to terminate a pre-viability pregnancy. *Casey*, 505 U.S. at 846, 112 S.Ct. 2791;[11] *Roe*, 410 U.S. at 164–65, 93 S.Ct. 705. Although the Constitution guarantees women the liberty to make the "ultimate decision" to undergo an abortion, *Casey*, 505 U.S. at 879, 112 S.Ct. 2791, the state may safeguard its interest in potential life by regulating the means by which abortion may be secured, so long as its regulations do not pose an "undue burden" on the woman's ability to obtain an abortion, *id.* at 874, 112 S.Ct. 2791. "An undue

Lawall I, 180 F.3d at 1026 (describing split as of 1999); *A Woman's Choice—East Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir.2002) (agreeing subsequently that abortion has been excepted from *Salerno*). *But see Stenberg v. Carhart*, 530 U.S. 914, 1018–19, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (Thomas, J., joined by Rehnquist, C.J., and Scalia, J., dissenting) (arguing against a unique "large fraction" standard for facial challenges in undue burden cases); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 164–65 (4th Cir.2000) (noting circuit split and applying *Salerno* to an abortion challenge).

10. As we explain later, where, as here, the question before us concerns the existence of an adequate health exception, facial challenges may prevail in an even broader group of cases: those where a law could preclude an abortion " 'where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' " *Stenberg*, 530 U.S. at 930, 120 S.Ct. 2597 (quoting *Casey*, 505 U.S. at 879, 112 S.Ct. 2791) (emphasis removed). The abortion-specific "large fraction" standard is part and parcel of the undue burden analysis, which, *Stenberg* teaches, is independent of the need for an adequate health exception. *See id.*

11. The three-Justice lead opinion in *Casey* is in some parts the opinion of the Court and in some the limiting concurrence. Although the undue burden test was endorsed by only three justices, as the narrowest ground for the Court's holding it is as binding on the lower courts as would be a majority opinion. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Doyle*, 162 F.3d at 473. For that reason, all references to *Casey*, unless otherwise specified, are to the joint opinion.

burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* at 878, 112 S.Ct. 2791.

Minor women also possess a right to obtain an abortion. With regard to minors, however, the state has additional interests that may justify regulation of the manner in which they determine to undergo the procedure. *Danforth,* 428 U.S. at 74, 96 S.Ct. 2831. In the interest of fostering family involvement in her decision whether to undergo an abortion, a state may require a minor to obtain a parent or guardian's consent. *Bellotti II,* 443 U.S. at 643, 99 S.Ct. 3035. It may not, however, supply the parent with an "absolute ... veto," but must instead provide some means by which a pregnant minor may bypass the consent requirement. *Id.* (quoting *Danforth,* 428 U.S. at 74, 96 S.Ct. 2831). More specifically, the Constitution requires that a minor be able to bypass a parental consent requirement when she can establish that "either: (1) she is mature enough and well-informed enough to make her abortion decision ... independently of her parents' wishes; or (2) even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Lawall I,* 180 F.3d at 1027–28 (citing *Bellotti II,* 443 U.S. at 643, 99 S.Ct. 3035); *see also Ohio v. Akron Ctr. for Reproductive Health,* 497 U.S. 502, 511, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (*Akron II* ).[12]

One principle announced in *Roe,* which has remained constant before and after *Casey,* applies to adults and minors alike: Any abortion regulation must contain adequate provision for a woman to terminate her pregnancy if it poses a threat to her life or health. *See Stenberg,* 530 U.S. at 930, 120 S.Ct. 2597; *id.* at 947, 120 S.Ct. 2597 (O'Connor, J., concurring); *Casey,* 505 U.S. at 846, 112 S.Ct. 2791; *Roe,* 410 U.S. at 163–64, 93 S.Ct. 705. An adequate health exception, that is, is a *per se* constitutional requirement.

As the Court's approach in *Stenberg* makes clear, whether such an exception exists requires an analysis separate from any undue burden inquiry. *See* 530 U.S. at 930, 120 S.Ct. 2597. In *Stenberg,* the Court struck down a Nebraska law outlawing a "partial birth" abortion technique on the "independent" grounds that it (1) lacked a health exception and (2) "impose[d] an undue burden on a woman's ability to choose a[n abortion by the prohibited method], thereby unduly burdening the right to choose abortion itself." *Id.* (internal quotation marks and citation to *Casey* omitted). *See also Planned Parenthood of the Rocky Mountains Servs. Corp. v. Owens,* 287 F.3d 910, 918 n. 7 (10th Cir.2002) (understanding *Stenberg* to require separate "health exception" and "undue burden" inquiries).

**12.** Although *Danforth, Bellotti II,* and *Akron II,* the touchstones of the Court's jurisprudence on minors' access to abortion, were decided under the more stringent standard of scrutiny dictated by *Roe* rather than the undue burden standard instituted by *Casey,* the circuit courts have continued to apply the *Bellotti II/Akron II* requirements, *see, e.g., Blackard v. Memphis Area Med. Ctr. for Women, Inc.,* 262 F.3d 568, 576 (6th Cir.2001); *Planned Parenthood of the Blue Ridge v. Camblos,* 155 F.3d 352, 357 (4th Cir.1998), and the Supreme Court has chastised (and reversed) this court for failing to apply *Bellotti II* and *Akron II* faithfully. *See Lambert v. Wicklund,* 520 U.S. 292, 295–97, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997) (per curiam). We therefore continue to apply the substantive rules enunciated in those pre-*Casey* cases, while abiding by the undue burden standard set forth in *Casey* and its successors. *See Planned Parenthood of S. Ariz. v. Lawall,* 307 F.3d 783, 786 (9th Cir.2002) (*Lawall II* ).

■ Following *Stenberg*, we may not conduct the adequate medical exception analysis by weighing burdens to see if they are due or undue. *See* 530 U.S. at 930, 120 S.Ct. 2597. We must instead ascertain whether the Idaho statute contains the health exception that "the law requires." *Id.* To preclude a woman from receiving a medically necessary abortion is to impose an unconstitutional burden. *See id.* at 930, 934, 937–38, 120 S.Ct. 2597; *Owens*, 287 F.3d at 919 (holding that, under *Stenberg*, "in the absence of evidence that a health exception would 'never [be] necessary to preserve the health of women,' the statute must be declared unconstitutional" (alteration in original)); *id.* ("[I]f . . . the record shows that . . . the [statute] will infringe on the ability of *any* pregnant woman to protect her health, we must hold the statute unconstitutional.").[13]

There is little definitive law on what constitutes an adequate emergency medical exception. *Lawall I*, 180 F.3d at 1032. Under the law that exists, however, the importance of protecting a pregnant woman's life and health cannot be overstated. Under *Casey*, an abortion regulation is impermissible if "it *forecloses* the possibility of an *immediate* abortion despite some significant health risks" to the pregnant woman. 505 U.S. at 880, 112 S.Ct. 2791 (emphasis added). Even after fetal viability, when the state's interest in regulation is strongest, the Court has held that the state may regulate "*except* where it is necessary, in appropriate medical judgment, for the preservation of the life or

health of the mother." *Id.* at 879, 112 S.Ct. 2791 (quoting *Roe*, 410 U.S. at 164–165, 93 S.Ct. 705) (emphasis added). Moreover, under *Casey's* undue burden framework, once such a medical condition exists, the constitutional inevitability of an abortion defeats the state's interests in potential life, making it extremely likely that any regulation that affects the procedure, even if the procedure can eventually go forward, is unduly burdensome in light of the state's limited interests. *See Stenberg*, 530 U.S. at 930–31, 120 S.Ct. 2597; *Casey*, 505 U.S. at 880, 112 S.Ct. 2791.

Like the plaintiffs here, those in *Casey* argued that Pennsylvania's abortion statute did not exempt all situations in which an immediate abortion would be medically recommended. The Court in *Casey* agreed with the plaintiffs that, were the statute to "interfere" at all in those situations, it must be invalidated, but agreed with the Third Circuit that the medical-emergency exception Pennsylvania provided could be interpreted to encompass all of the medical conditions that might require immediate abortion. *Casey*, 505 U.S. at 880, 112 S.Ct. 2791.

■ A health exception is as requisite in statutory or regulatory provisions affecting only minors' access to abortion as it is in regulations concerning adult women. *See Owens*, 287 F.3d at 918 (citing *Danforth*, 428 U.S. at 74, 96 S.Ct. 2831). Idaho does not contend otherwise. It argues, rather, that the medical emergency exception to the parental-consent provision of section 18–609A; and the corresponding

---

**13.** It is not entirely clear that the *Stenberg* Court meant to overrule *Casey* insofar as *Casey* applied an undue burden test to the emergency medical exception in the statute it considered. *See Casey*, 505 U.S. at 880, 112 S.Ct. 2791. It may be that medical emergency exceptions are therefore not entirely outside the undue burden framework, *Stenberg* notwithstanding, but rather are subject to per se

analysis because preclusion of abortions where a mother's health is at stake is always an undue burden. We need not belabor this point, however, as the outcome in this case would be the same under the undue burden/large fraction standard, properly applied, as it is under the per se rule *Stenberg* applied with regard to health exceptions.

defense to prosecution of physicians under section 18–605, comports with *Casey's* requirements for an adequate health exception. The crux of this case is whether that is so.

### b. *Adequacy of the Health Exception*

 The Idaho statute allows physicians to perform abortions on minors who have not secured their parent's or a court's permission only when "[a] medical emergency exists for the minor so urgent that there is insufficient time for the physician to obtain the informed consent of a parent or a court order and the attending physician certifies such in the pregnant minor's medical records." Idaho Code § 18–609A(1)(a)(v). The physician must record the factual basis for his determination. *Id.*

"Medical emergency" is in turn defined as

a sudden and unexpected physical condition which, in the reasonable medical judgment of any ordinarily prudent physician acting under the circumstances and conditions then existing, is abnormal and so complicates the medical condition of the pregnant minor as to necessitate the immediate causing or performing of an abortion:

1. To prevent her death; or

2. Because a delay in causing or performing an abortion will create serious risk of immediate, substantial and irreversible impairment of a major physical bodily function of the patient.

Idaho Code § 18–609A(5)(c)(i). A medical emergency cannot be:

1. Any physical condition that would be expected to occur in normal pregnancies of women of similar age, physical condition and gestation; or

2. Any condition that is predominantly psychological or psychiatric in nature.

Idaho Code § 18–609A(5)(c)(ii). The statute therefore appears to allow an abortion without proper consent only when the minor (1) has a medical condition that is (a) "sudden," (b) "unexpected," (c) "abnormal," that is, "not expected to occur in normal pregnancies of women of similar age, physical condition and gestation," *and* (d) not primarily psychological or psychiatric; that (2) necessitates an immediate abortion to save her life or prevent a serious risk of permanent, substantial injury to a major bodily function; and that (3) must be performed for those reasons sooner than consent could be secured.

Plaintiffs claim that these strictures make the emergency medical exception constitutionally inadequate. As they read the statute, it requires the patient's *condition*—not the fact that the condition necessitates an immediate abortion—to be sudden, unexpected, and abnormal. As we discuss later, plaintiffs describe a number of medical conditions that are emergencies in the usual sense, in that once diagnosed they require an immediate abortion to preserve the mother's life or health, but not in the statutory one, as they are not sudden, unexpected, and abnormal. Ergo, they argue, the statute's definition of "medical emergency" renders the maternal health exception unconstitutionally narrow.

Idaho's disagreement with this line of argument is with plaintiffs' interpretation of the statute, not with their medical evidence. The state does not contend that, were we to agree with plaintiffs' interpretation of the function of the qualifiers "sudden," "unexpected," and "abnormal" in the statute, medical conditions such as those plaintiffs identify would still satisfy the statute. Instead, Idaho's position, with which the district court largely agreed, is that "sudden" refers, not to the pregnant woman's physical condition, but to the "moment of diagnosis" of that condi-

tion by a physician. "Unexpected," similarly, reflects a physician's inability to "predict 'exactly when' an emergency is going to happen." "Abnormal" has no function in the statute, on this reading, because a normal pregnancy is ipso facto free from any event necessitating that it be terminated.[14] Idaho's interpretation is neither plausible nor logical in light of the statute's language, structure, and background.

### (i.) The Plain Language of the Statute

As we are construing a state statute, our role is to interpret the law as would the Idaho Supreme Court. *In re Kolb*, 326 F.3d 1030, 1037 (9th Cir.2003). Our interpretation of the medical emergency provision must begin with the text of the statute. *Purco Fleet Servs., Inc. v. Idaho State Dep't of Finance*, 140 Idaho 121, 90 P.3d 346, 349 (2004). Accordingly, words "should be given the same meaning in a statute as they have among the people who rely on and uphold the statute. Every word, clause and sentence should be given effect, if possible. When construing a statute, its words must be given their plain, usual and ordinary meaning." *Id.* at 349–50 (citations omitted).

If the plain language does not conclusively determine the statute's meaning, we must presume that the Idaho legislature both intended to and did in fact act constitutionally, *see Akron II*, 497 U.S. at 514, 110 S.Ct. 2972; *Akron I*, 462 U.S. at 441, 103 S.Ct. 2481, and indulge in any reasonable construction that can save the statute from invalidity. *Hooper v. California*, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895). We may not, however, "rewrite" the statute to save it, *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir.2002) (en banc), and any narrowing construction of a state statute adopted by a federal court must be a "reasonable and readily apparent" gloss on the language, *Stenberg*, 530 U.S. at 944–45, 120 S.Ct. 2597 (internal quotation marks and citations omitted).

This litigation focuses on the terms "sudden and unexpected" and "abnormal" in the Idaho statute's definition of "medical emergency." In *Casey*, the Supreme Court upheld a medical emergency definition which was somewhat similar to that provided in section 18–609A(5)(c) but lacked any requirement that the condition giving rise to the emergency be sudden, unexpected, or abnormal. *See Casey*, 505 U.S. at 879, 112 S.Ct. 2791. The Pennsylvania statute upheld in *Casey* defines "medical emergency" as

> [t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function.

---

14. The state presented the testimony of doctors who agree with Idaho's construction of the statute, and cross-examined the plaintiffs' physician experts regarding their understanding of the statute. These expert statements regarding the meaning of the statute are not *evidence*, however, and the district court made no correlative factual findings to which we might defer. The witnesses' elaborations of the meanings of "sudden," "unexpected,"

and "abnormal" do not control our statutory construction. The interpretation of those terms is a "matter[ ] of law for the court's determination," *Aguilar v. Int'l Longshoremen's Union, Local # 10*, 966 F.2d 443, 447 (9th Cir.1992), as the meaning of a statute is perhaps the quintessential question of law, *see Nelson v. Heiss*, 271 F.3d 891, 893 (9th Cir. 2001).

*Id.* (quoting 18 Pa. Cons.Stat. § 3203 (1990) (alteration in *Casey* )). Essentially this same definition is used in the statutes of 26 states.[15] The question, then, is whether the plain meaning of Idaho's different definition—or, failing that, a "reasonable and readily apparent" narrowing construction of it—provides a medical emergency exception that satisfies *Casey.* Idaho in effect argues that its exception, despite its limiting language and different structure, is precisely equivalent to the one in *Casey,* and therefore must be upheld.

The medical emergency provision here, however, is neither ambiguous nor substantially the same as the medical emergency provision approved in *Casey.* The Idaho statute states that a physician is allowed to perform the procedure without delay *only* for those medical conditions that a prudent physician would take to necessitate an immediate abortion and that are "sudden and unexpected" and "abnormal." The constitutionality of the challenged provision thus stands or falls on whether the limitation to "sudden and un-

expected" and "abnormal" conditions, not contained in the *Casey*-approved statute, excludes some conditions that indicate the need for an immediate abortion to protect a woman's health. The record shows that it does.

For a number of medical conditions, as physicians offered as expert witnesses by both the plaintiffs and the state explained, the onset of the underlying condition and its diagnosis come at different times. If the condition is discovered early enough, the situation might not "necessitate the immediate causing or performing of an abortion." Idaho Code § 18–609A(5)(c)(i). There might not be a need for an abortion, or it might be possible to schedule a non-emergency abortion. Often, however, these conditions cannot be, or are not, diagnosed until the patient suffers acute symptoms.[16] At that point, the patient's symptoms are not sudden and unexpected in light of the underlying condition. For example, a uterine infection might set in gradually, not suddenly, as might HELLP syndrome, a form of preeclampsia.[17] In

---

**15.** Twenty-three states use language extremely similar or identical to Pennsylvania's. *See* Ala. Code § 26–22–2(6) (2003); Alaska Stat. § 18.16.010(g) (Michie 2003); Ariz. Rev. Stat. § 36–2301–01(C)(2) (2003); Ark. Code Ann. § 20–16–902(7) (Michie 2003); Colo. Rev. Stat. § 12–37.5–103(5) (2003); Conn. Gen. Stat. § 19a–601(e) (2003); Del Code Ann. tit. 24, § 1782(d) (2003); Fla Stat. ch. 390.01115 (2003); Iowa Code § 135L.1 (2003); Kan. Stat. Ann. § 65–6701(e) (2003); Mich Comp. Laws § 333.17015(e) (2003); Minn. Stat. § 145.4241(4) (2003); Mont. Code Ann. § 50–20–203(5) (2003); Neb. Rev. Stat. § 28–326(7) (2003); N.J. Stat. Ann. § 9:17A–1.3 (2003); N.D. Cent. Code § 14–02.1–02(7) (2003); 18 Pa. Cons.Stat. § 3203 (2003); S.C. Code Ann. § 44–41–320(1) (Law Co-op.2003); S.D. Codified Laws § 34–23A–1(3) (Michie 2003); Tex. Fam. Code § 33.002(a)(4)(A) (Vernon 2003); Utah Code Ann. § 76–7–301(2) (2003); W. Va. Code § 16–2I–1(c)(2003); Wis. Stat § 48.375(4)(b) (2003). The New Jersey statute has been invalidated on other grounds but

remains formally on the books. *See Planned Parenthood of Cent. N.J. v. Farmer,* 165 N.J. 609, 762 A.2d 620 (2000). Three other states have functionally similar definitions to that in *Casey,* though they do not track the Pennsylvania language. *See* Ind. Code § 16–34–2–4(i) (2003); La. Rev. Stat Ann. § 40:1299.35.12 (West 2003); Wyo. Stat. Ann. § 35–6–118(c) (Michie 2003).

**16.** It is especially likely that minors will present with symptoms that could have been prevented through earlier diagnosis. As Weyhrich testified, and Idaho does not dispute, minors tend to seek medical attention and abortion services later in pregnancy than do adult women. *See Akron II,* 497 U.S. at 532, 110 S.Ct. 2972 (Blackmun, J., dissenting) (noting the same fact).

**17.** One of the plaintiffs' experts explained that HELLP syndrome involves hypertension, elevated liver enzymes, and low platelets. The expert testified that although a patient begin-

other conditions, such as ectopic or cornual pregnancy, the necessity of an abortion at some later time can be expected long before the procedure must be performed, *if* the condition is diagnosed before it becomes symptomatic.[18] Nonetheless, the plaintiffs claim, *were* a minor to present with a symptomatic ectopic pregnancy requiring an abortion immediately after diagnosis, the statute would not allow the abortion without obtaining parental consent, because at that point the underlying medical condition had existed for some time and was not "sudden." Additionally, the plaintiffs' experts suggested that certain pregnancy-related consequences regularly occur in women with a particular pre-pregnancy "physical condition" but a "normal pregnancy." Yet, such conditions may require an immediate abortion during pregnancy. One example, explained at trial, would be Marfan's syndrome, a congenital condition that produces a weak aorta that can rupture under the strain of pregnancy.

Idaho's experts disputed that the terms "sudden" and "unexpected" would necessarily exclude those conditions, as they read the Idaho statute to focus on the time of diagnosis, not the time a medical condition actually begins to develop. Idaho's experts did not, however, dispute any of the underlying medical facts, such as the etiology, method of diagnosis, or urgency of performing an abortion once the conditions are detected.

Consonant with the Idaho rule that we look to the meanings of statutory terms as they are used by the regulated community, *see Purco Fleet,* 90 P.3d at 349, Idaho directs our attention to several medical dictionaries and reference works defining "emergency" with the aid of the words "sudden" and "unexpected." Idaho argues that these definitions show that the phrase "sudden and unexpected" does not limit, but merely explicates, the term "emergency." The argument is structurally similar to the contention that using the term "motor vehicle" in the definition of "automobile" would not limit the scope of "automobile." The Idaho statute, according to this view, means nothing different than the Pennsylvania statute upheld in *Casey.* What appear to be restrictions on the sorts of urgent medical circumstances that would constitute an emergency under the statute, Idaho argues, are only illustrative of the ordinary meaning of "emergency" that the statute employs. There are three problems with this position:

*First,* Idaho's attempt to avoid giving content to the words "sudden," "unexpected," and "abnormal" is incompatible with the statute.

Section 18–609A(5)(c)(i) defines a medical emergency as a "sudden and unexpected *physical condition* which . . . is abnormal and . . . necessitate[s] the immediate causing or performing of an abortion" (emphasis added). The district court's construction, defended by Idaho, would have "sudden" describe the moment of diagnosis

---

ning to feel symptoms of HELLP syndrome might "really not feel sick," the syndrome could become fully symptomatic in one or two weeks. (Idaho's expert testified that the syndrome could become manifest within four to five days.) HELLP syndrome would then cause death if the pregnancy were allowed to continue.

**18.** Idaho's expert witness testified that an ectopic pregnancy occurs when an embryo be-

comes implanted in a fallopian tube rather than the uterus. That condition, however, will not become known to the patient or her doctor until the pregnancy has been in place for some time. Because the fallopian tube cannot expand, the growth of the embryo may lead the tube to rupture, which can be fatal to the mother. The expert testified that ectopic pregnancies can never be viable and acknowledged that rupture is to be anticipated once it is known a woman has an ectopic pregnancy.

of the minor's condition by her physician, and "unexpected" "refer[ ]" to the fact that a physician cannot predict 'exactly when' an emergency is going to happen." But a diagnosis is not a physical condition. Idaho's reading simply ignores the noun that "sudden and unexpected" modifies and substitutes its own, "diagnosis," which does not appear in the statute. *See Stenberg*, 530 U.S. at 944–45, 120 S.Ct. 2597 (refusing to adopt an interpretation of an abortion statute that was not "reasonable [or] readily apparent" (quoting *Boos v. Barry*, 485 U.S. 312, 330, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988))). What's more, *every* medical diagnosis would be, in this sense, "sudden and unexpected," as the physician always comes in one moment to possess a definitive diagnostic opinion he lacked and did not expect the moment before.

Idaho posits that the substantive provision in section 18–609A(1)(a)(v)—requiring that the minor's physical condition necessitate an immediate abortion—cures any unconstitutional narrowing worked by the inclusion of "sudden and unexpected." The plain meaning of the text, however, is that, of all the physical conditions that might necessitate an immediate abortion, only for the "sudden and unexpected" ones is a physician allowed to perform the procedure on a minor who has not secured parental or judicial consent.

The definition further focuses on whether the condition is "abnormal," Idaho Code § 18–609A(5)(c)(i), by excluding "[a]ny *physical condition* that would be expected to occur in normal pregnancies of women of similar age, physical condition and gestation," *id.* § 18–609A(5)(c)(ii)(1) (emphasis added). We interpret words within the same statute in light of one another, *Bramwell v. U.S. Bureau of Prisons*, 348 F.3d 804, 807 (9th Cir.2003), and so must construe "abnormal" in section 18– 609A(5)(c)(i) alongside "normal" as used in section 18–609A(5)(c)(ii)(1).

The wording of section 18– 609A(5)(c)(ii)(1) is, to say the least, confusing: It states that a "physical condition" cannot be a "medical emergency" if "expected" to occur in a "normal" pregnancy of women of, *inter alia,* a "similar . . . physical condition." *Whenever* a pregnancy is "normal," women of similar "physical condition[s]" would be "expected" to have "similar . . . physical condition[s]," even if one supposes, to avoid tautology, that the first reference to "physical condition" means one initially occurring during the pregnancy, while the second refers to a condition that existed prior to the pregnancy. Yet, the evidence at trial showed that a "normal" pregnancy can trigger a need for an immediate abortion in some or most women with a given prior general "physical condition" (Marfan's syndrome, for example, or leukemia). Hence, the definition as a whole appears to limit the medical emergency provision to abnormal pregnancies, as opposed to emergencies triggered by the combination of a pre-existing medical condition and a normal pregnancy. For this reason as well, it excludes some situations in which *Casey* demands an abortion be available to women who need one.

■ *Second,* Idaho's argument invites us to regard several grammatically indispensable words in the statute as surplusage. On this view, if "sudden and unexpected" were deleted, the statute would have precisely the same meaning as it does with that modifier. Yet "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v.*

*Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)); *see also Harper v. U.S. Seafoods LP,* 278 F.3d 971, 975 (9th Cir.2002). While this rule against surplusage is not absolute, the statute in question does not fall under any of the usual exceptions. The words "sudden," "unexpected," and "abnormal" were plainly neither "inadvertently inserted" nor "repugnant to the rest of the statute," *Chickasaw Nation v. United States,* 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (quotation marks and citation omitted), nor are they "patently" surplusage, *Thornburgh v. Am. College of Obstetricians & Gynecologists,* 476 U.S. 747, 769, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled in part on other grounds by Casey,* 505 U.S. at 882, 112 S.Ct. 2791.

Further, courts are especially reluctant to discard as surplusage the "pivotal" words of a statute. *See Duncan,* 533 U.S. at 174, 121 S.Ct. 2120. Were the Idaho legislature not intending a medical emergency definition narrower than the one approved in *Casey* and used in the majority of states, surely it would have taken the safe road and enacted a provision already deemed valid by the Supreme Court. As noted,[19] more than half of the states have adopted language similar to that of the Pennsylvania law *Casey* upheld. *None* of those state statutes apply intensifiers or modifiers like "sudden," "unexpected," or "abnormal" to the pregnant woman's medical condition. That the Idaho legislature chose to include the narrowing terms "sudden," "unexpected," and "abnormal," as well as the limiting language of section 18–609A(5)(c)(i), therefore indicates that these specially added terms "cannot be regarded as mere surplusage; [they] mean[ ] something." *Potter v. United States,* 155 U.S. 438, 446, 15 S.Ct. 144, 39 L.Ed. 214 (1894). *See also Brockett v. Spokane Arcades,*

*Inc.,* 472 U.S. 491, 505 n. 13, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (interpreting the legislative intent behind a definition given in Washington's obscenity statute in light of definitions used in other states' laws).

*Third,* Idaho's proffered dictionary definitions do not illuminate the meaning of the statute, much less, as Idaho argues, show that "sudden and unexpected" merely explains "medical emergency" in a commonsense fashion. *Dorland's Illustrated Medical Dictionary* 584 (29th ed.2000) defines an emergency as "an unlooked for or sudden occasion; an accident; an urgent or pressing need." This definition is consistent with common usage but not with the statute. Unlike *Dorland's,* the statute defines an emergency not as an "occasion"—an event in time—but as a "condition" of the pregnant woman. That a woman's distress comes on suddenly does not mean that her physical condition came on suddenly. The *Dorland's* definition thus bolsters, rather than detracts from, the interpretation of the statute as limited to only *certain* medical emergencies.

Taber's Cyclopedic Medical Dictionary 686 (19th ed.2001), like Idaho, conflates the underlying medical condition with the emergency situation, defining an emergency as both "[a]ny urgent *condition* perceived by the patient as requiring immediate medical or surgical evaluation or treatment" and as "[a]n unexpected[,] serious *occurrence* that may cause a great number of injuries ..." (emphasis added). Although it thereby provides some support for Idaho's arguments that interchange the underlying condition with the emergency situation, it otherwise runs counter to the Idaho statute, which does not provide that the patient's perception

19. *See* note 15 *supra.*

of her own distress is determinative of whether or not an emergency exists.

*Merriam–Webster's Medical Desk Dictionary* 207–08 (1986) gives as its definition: "an unforeseen combination of circumstances or the resulting state that calls for immediate action: as *a:* a sudden bodily alteration (as a ruptured appendix or surgical shock) such as is likely to require immediate medical attention[;] *b:* a usu[ally] distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen[.]"[20] Idaho suggested at trial that the last clause of this definition ensures that plaintiffs' concerns are misplaced, as even a condition that can be "anticipated" would still be an emergency. But the *Merriam–Webster* definition does *not* use the terms "unexpected" or "abnormal." An alternative definition of "emergency" inconsistent with the statutory language is of no aid in determining the reach of the more limited statutory language.

Putting to one side the category mistake[21] of equating a condition with an event, Idaho's proffered definitions fail to establish that the words "sudden and unexpected," much less the distinction of "normal" and "abnormal" in the statute, are surplusage. As applied to a physical condition rather than to a circumstance, event, or occurrence, "sudden and unexpected" narrows the class of ailments that common sense would deem to give rise to medical emergencies. That is, *some* physical conditions, recognized by the medical community, come on gradually and follow an expected course that only eventually becomes life- or health-threatening. One would ordinarily use the term "medical emergency" to refer to the point at which a medical condition presents acute symptoms or is otherwise discovered and therefore must be attended to in order to avoid permanent consequences. The statute, however, excludes some medical conditions that give rise to an emergency situation from its definition of medical emergencies.

We therefore conclude that, given the plain meaning of the medical-emergency definition, the emergency restriction is unconstitutionally narrow. For some minor women, the statute will unconstitutionally allow Idaho "to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health," which the "essential holding of *Roe* forbids[.]" *Casey*, 505 U.S. at 880, 112 S.Ct. 2791.

### (ii.) Limiting Construction

Ordinarily, in construing a state statute, we follow that state's rules of statutory interpretation. *In re Kolb*, 326 F.3d at 1037. Under Idaho law, where a statute is unambiguous, there is "no occasion for

---

**20.** Idaho also relies on *Stedman's Medical Dictionary* 582 (27th ed.2000), which defines an emergency as "[a] patient's condition requiring immediate treatment" (but does not include the "sudden," "unexpected," or "abnormal" limitations), and *Black's Law Dictionary* 523 (6th ed.1990), which defines an emergency as "[a] sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action without time for full deliberation"

(and thus uses "occasion" rather than "condition" as the basic concept). (The current edition of *Black's* does not define "emergency." *See Black's Law Dictionary* 541 (7th ed.1999).) These definitions raise no considerations distinct from those discussed regarding the three definitions addressed in the text.

**21.** *See* GILBERT RYLE, THE CONCEPT OF MIND 15 (1949) (explaining that a category mistake treats a concept "as if [it] belonged to one logical type or category ..., when [it] actually belong[s] to another").

construction." *State v. Maidwell,* 137 Idaho 424, 50 P.3d 439, 441 (2002). It is only where a statute is susceptible to two meanings that Idaho courts will defer to the state legislature and give effect to a constitutional meaning instead of an unconstitutional one. *Idaho State AFL–CIO v. Leroy,* 110 Idaho 691, 718 P.2d 1129, 1136 (1986).

The Supreme Court, however, has instructed us to assume that state courts will endeavor to construe abortion statutes constitutionally, *Akron I,* 462 U.S. at 441, 103 S.Ct. 2481, and the Court itself plainly endeavors to abide by any reasonable constitutional interpretation that is available. *See, e.g., Stenberg,* 530 U.S. at 944–45, 120 S.Ct. 2597; *Casey,* 505 U.S. at 880, 112 S.Ct. 2791. Hence, while under Idaho law the plain-meaning inquiry would almost surely be the end of the matter, we also consider whether, supposing the statute to be in some respect ambiguous, a limiting construction is available.

After careful consideration, we conclude that Idaho's reading of the statute, adopted by the district court, is simply not "fairly possible," *see Arizonans for Official English v. Arizona,* 520 U.S. 43, 78, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), much less "readily apparent," *Stenberg,* 530 U.S. at 944–45, 120 S.Ct. 2597. As already discussed, the only constitutional construction we have been offered, and the only one we can adduce, would read "sudden and unexpected" to modify a subject, the moment of diagnosis, that does not appear anywhere in the statute. Alternatively, that construction would read "sudden," "unexpected," and "abnormal" out of the statute. There simply is no meaning that can be given to "sudden," "unexpected," and "abnormal" that would make sense of the grammar of the provision, avoid surplusage, and ensure that the medical emergency definition would encompass the medical circumstances, described above, that can necessitate an immediate abortion.

▮ The Idaho legislature must have "know[n] how to provide a medical-emergency exception," *Thornburgh,* 476 U.S. at 771, 106 S.Ct. 2169, since, at the time the law in question was enacted, more than half of the states had adopted, and *Casey* had upheld, language *without* the added strictures Idaho has included. The only way to save the statute would be to ignore those added, operative words, a step that is not "reasonable and readily apparent," *Stenberg,* 530 U.S. at 944, 120 S.Ct. 2597 (quotation marks and citation omitted). *See also Duncan,* 533 U.S. at 174, 121 S.Ct. 2120 (rejecting a proposed interpretation that would give a statute precisely the meaning it would have if a word were deleted); *United States v. Handy,* 761 F.2d 1279, 1280 (9th Cir.1985) (same).[22]

---

**22.** Idaho has not asked us to certify the meaning of its parental consent statute to the Idaho Supreme Court pursuant to Idaho Appellate Rule 12.2. Although determination of important questions of state law are best left in the hands of state courts, *see Bellotti v. Baird,* 428 U.S. 132, 146–47, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (*Bellotti I* ), there is here no point in certification. Certification is appropriate only when the challenged statute is "fairly susceptible" to a salvaging interpretation. *Stenberg,* 530 U.S. at 945, 120 S.Ct. 2597; *see also Bellotti I,* 428 U.S. at 147, 96 S.Ct. 2857.

While the Idaho courts may have broader authority than we to issue a narrowing construction of the statute as a matter of federalism, *see Bellotti I,* 428 U.S. at 147, 96 S.Ct. 2857, Idaho does not choose to construe its statutes to comport with the constitution unless the statute is truly susceptible to a constitutional interpretation. *Idaho AFL–CIO,* 718 P.2d at 1136. As the state's interpretation is inimical to the statute's language, certification to the Idaho Supreme Court is not appropriate.

In considering whether a limiting construction is available, we are especially mindful of our uncomfortable position as a federal court construing a state statute. Our construction is not binding upon the Idaho courts, which may yet offer a limiting construction notwithstanding our holding that the statute, as we have construed it, is invalid. *See Moore v. Sims,* 442 U.S. 415, 428, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *see generally* Richard H. Fallon, Jr., *Making Sense of Overbreadth,* 100 YALE L.J. 853 (1991). "In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

Still, the limitation of federal courts to "reasonable and readily apparent" interpretations of state statutes is an important one. State courts have more latitude to interpret state statutes to avoid constitutional invalidity. When federal courts rely on a "readily apparent" constitutional interpretation, plaintiffs receive sufficient protection from unconstitutional application of the statute, as it is quite likely nonparty prosecutors and state courts will apply the same interpretation. Where federal courts apply a strained statutory construction, however, the state courts and non-party prosecutors, not bound by a federal court's reading of a state statute, are free to, and likely to, reject the interpretation and convict violators of the statute's plain meaning. The result is inadequate relief from unconstitutional prosecution for plaintiffs who do not or cannot sue every conceivable state prosecutor who could institute proceedings against them.

■ This is not to say, of course, that federal courts may never construe state statutes. Where, however, as here, any limiting construction would impinge upon the separation of powers within Idaho's government by construing a statute against the legislature's likely intent, the equitable discretion of federal courts asked to enjoin state statutes is best employed by avoiding unnecessary, and ultimately meaningless, forays into rewriting state laws. It is enough for us to observe that the plain meaning of the statute is unconstitutional, and that any constitutional construction is not "readily apparent."

### (iii.) Interaction of the Medical Emergency Definition and Criminal Liability Provision

■ Finally, even if the definition of "medical emergency" could be salvaged, the substantive provision for emergency abortions would still be unconstitutional. Section 18–609A(1)(a)(v) allows such an abortion only when the emergency is "so urgent that there is insufficient time for the physician to obtain the informed consent of a parent or a court order[.]" In *Lawall I,* we considered Arizona's very similar parental-consent statute. That law's medical-emergency exception also hinged upon the availability of parental or judicial consent, and also subjected a physician to potential criminal liability should he perform an abortion in violation of the statute. Although the Arizona statute only required that the doctor certify that, in his "good faith clinical judgment," insufficient time existed to secure a parental or judicial bypass, we held that the uncertainty over precisely how long a judicial bypass in Arizona might take rendered the provision void for vagueness. 180 F.3d at 1032–33.

As in *Lawall I,* Idaho's statute provides no absolute deadline by which appeals from a denial of judicial bypass will be completed. The Arizona statute did not provide deadlines that would support a "reasonable estimate" of how long a by-

pass might take to secure. Unlike the *Lawall I* statute, Idaho has provided one explicit deadline: Section 18–609A(1)(c) indicates that a trial court is to issue a decision within five days, and any appeal is to receive "expedited appellate review."[23] However, the district court in this case declared that the two-day time period for the minor to *file* her appeal is unconstitutional, and Idaho has acquiesced in that determination. Additionally, the statute allows the district court to extend the time for decision beyond five days for "good cause" without specifying the reach of the "good cause" exception. Idaho Code § 18–609A(1)(d). Given the open-ended time period in which a decision can be rendered, the now-unspecified deadline for filing a notice of appeal, and the indeterminate period during which the Idaho appellate process may run its course even on an expedited basis, there is no way for an Idaho doctor to be reasonably certain that an emergency abortion *must* be performed before a bypass could be obtained.[24] Were he subject only to a good-faith standard, as under the law before us in *Lawall I*, the Idaho deadlines might provide sufficient guidance. But section 18–609A, unlike the Arizona statute, does not apply a subjective, good-faith standard.

■ Idaho argues that any vagueness challenge is mooted by the fact that section 18–605(3)'s criminal provision applies only where a physician "knowingly" vio-

lates the law. To be subject to prosecution, a doctor would, under the state's position, need to have performed an emergency abortion while *knowing* there was sufficient time to obtain a bypass.[25] But again, a careful reading of the statute precludes this construction. Idaho would have as an element of a felony whether a physician *knew* that "there is insufficient time for the physician to obtain the informed consent of a parent or a court order." Idaho Code § 18–609A(1)(a)(v). As just discussed, however, whether there is enough time to get a court order under Idaho's scheme is unknowable in advance, which is when the physician would have to "know" it. A scienter requirement of knowledge as applied to an unknowable element cannot save a provision from constitutional invalidity.

Again, the medical emergency provisions upheld in *Casey* (and the one invalidated on other grounds in *Lawall I*) plainly included a subjective standard—an allowance that a physician may act by his own medical judgment so long as he acts in good faith—rather than the objective, "prudent physician" standard Idaho chose. *See Casey*, 505 U.S. at 879, 112 S.Ct. 2791; *Lawall I*, 180 F.3d at 1032. For the same reasons we were reluctant to read "sudden," "unexpected," and "abnormal" out of the statute, we are similarly reluctant to suppose that Idaho's unique statutory

---

23. The *Lawall I* court found Arizona's prescription of an "expedited ... appeal" insufficiently definite. *Lawall I*, 180 F.3d at 1027.

24. Idaho notes that the appellate expedition provision is indistinguishable from that upheld against a facial challenge in *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476, 491 n. 16, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). We do not here consider, however, whether the Idaho statute satisfies *Bellotti II's* requirement of an expeditious bypass, but rather whether a physician may

be subjected to criminal prosecution for failing correctly to estimate how long even an expeditious bypass might take.

25. The scienter requirement applies only to the criminal, not to the civil or administrative, penalties the physician faces under section 18–605. Subjecting the physician to strict civil liability for not knowing how long a judicial bypass could take may still chill his willingness to provide a medically necessary abortion in a large fraction of relevant cases.

scheme really means, by operation of the scienter requirement in section 18–605(3), the same thing as statutes the Idaho legislature already knew to be safely constitutional when it chose quite different language.

More importantly, the structure of the medical emergency provision fails to abide by *Casey's* explanation of why an emergency exception must be provided in the first place. *Casey's* undue burden test is meant to reflect the dual, sometimes antagonistic considerations, of the woman in obtaining an abortion and of the state in protecting her health and "the life of the fetus that may become a child." *Casey*, 505 U.S. at 846, 112 S.Ct. 2791. Where the pregnancy is that of a minor, the state has additional interests in protecting the minor from decisions she is too immature to make and in protecting her family's role in those decisions. *See Bellotti II*, 443 U.S. at 633–34, 99 S.Ct. 3035. *Casey* explains that where the medical circumstances require that an abortion be performed, the state's interests in potential life must give way altogether to the pregnant woman's health. *See* 505 U.S. at 899, 112 S.Ct. 2791.

The state does retain interests in the pregnant minor's wellbeing even when a medical emergency necessitating an abortion materializes. However, the emergency-consent provision in the statute before us contrasts with Idaho's general provision for emergency medical consent:

> Whenever there is no person readily available and willing to give or refuse consent as specified hereinabove in this

act, and in the judgment of the attending physician or dentist the subject person presents a medical emergency or there is substantial likelihood of his or her life or health being seriously endangered by withholding or delay in the rendering of such hospital, medical, dental or surgical care to such patient, the attending physician or dentist may, in his discretion, authorize and/or provide such care, treatment or procedure as he or she deems appropriate, and all persons, agencies and institutions thereafter furnishing the same, including such physician or dentist, may proceed as if informed, valid consent therefor had been otherwise duly given.

Idaho Code § 39–4303(c). Thus, if parental consent is ordinarily necessary, but not "readily available" in a particular instance, a physician may, except with regard to abortion, go forward with an indicated medical procedure.[26] In abortion cases, however, the doctor can be exposed to potential criminal liability if he proceeds without either parental consent or a judicial bypass, even if there is in fact a medical emergency and parental consent is not readily available.[27]

Idaho has provided no explanation, and we can find none in the precedents, for why a state has a greater interest in involving a pregnant minor's family in an *emergency* abortion necessary to protect the minor's life or health than in any other medical *emergency* requiring immediate treatment. Yet, section 18–609A(1)(a)(v) precludes a physician from performing an

---

**26.** Minors aged fourteen and older may in Idaho supply their own consent to treatment for infectious, contagious, or communicable diseases. Idaho Code § 39–3801. Otherwise, consent is required, which parents or legal guardians may provide. Idaho Code § 39–4303(a). The provision quoted in the text, section 39–4303(c), pertains to circumstances where section 39–3801 does not apply and no parent is available to consent.

**27.** Also, in emergencies other than those requiring abortions, physicians in Idaho have absolute immunity when, in good faith, they act without consent because they believe there is an emergency so requiring. *See* Idaho Code § 39–4303(d).

immediate abortion in circumstances in which he *would* be authorized to perform any other emergency life- or health-saving procedure on a minor. *Casey* is clear that any abortion regulation must serve *some* identifiable state interest. Idaho has failed to show what interest is served by allowing emergency abortions in a more narrow set of circumstances than did the law upheld by *Casey,* and than does the state law generally applicable to medical consent.

We conclude that section 18–609A(1)(a)(v), in conjunction with section 18–605, provides an inadequate health exception for minors who require abortions to save their lives or avert serious threats to their health.

### c. Severability

■ As noted at the outset, Weyhrich and Planned Parenthood raise substantive challenges to several other provisions of sections 18–605, 18–609A, and 18–614. We need not address any of them, however. The parental consent requirement cannot stand in the absence of a valid medical emergency exception. The parental consent statute concludes with a meticulous severability provision:

> If any one (1) or more provision, section, subsection, sentence, clause, phrase, or word of this chapter or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this chapter shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it would have passed every section of this chapter and each provision, section, subsection, sentence, clause, phrase or word thereof irrespective of the fact that any one (1) or more provision, section, subsection, sentence, clause, phrase or word be declared unconstitutional.

Idaho Code § 18–615. The legislature invites us to save as much of the statute as possible by invalidating as little of it as necessary. No severance, however, can avoid invalidation of the medical emergency provision as a whole. Once that provision is stricken, the remainder of the statute would be plainly unconstitutional. *See Stenberg,* 530 U.S. at 931, 120 S.Ct. 2597; *Lawall I,* 180 F.3d at 1033.

We are guided, of course, by principles of federalism, which counsel that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." *Brockett,* 472 U.S. at 502, 105 S.Ct. 2794. As almost every operative provision of the parental consent statute is before us in this appeal, however, we have little choice but to consider the ramifications of the invalid medical-emergency exception for the whole of the law.

■ In doing so, we must follow the approach the Idaho Supreme Court would take to the severability question. *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). Under Idaho law,

> Whether portions of a statute which are constitutional shall be upheld while other portions are eliminated as unconstitutional involves primarily the ascertainment of the intention of the legislature. When part of a statute or ordinance is unconstitutional and yet is not an integral or indispensable part of the measure, the invalid portion may be stricken without affecting the remainder of the statute or ordinance. However, if an unconstitutional portion of a statute is integral or indispensable to the operation of the statute as the legislature intended, the provision is not severable, and the entire measure must fail.

*State v. Nielsen*, 131 Idaho 494, 960 P.2d 177, 180 (1998) (citations omitted). This "integral or indispensable part" standard is regularly applied by the Idaho Supreme Court, whether or not the statute under consideration contains a severability clause.

In *Boundary Backpackers v. Boundary County*, 128 Idaho 371, 913 P.2d 1141, 1148 (1996), for example, that court considered a county ordinance with a savings clause nearly as explicit as the one here.[28] The Idaho Supreme Court ruled that it was nonetheless unable to sever an unconstitutional provision because such a step would "emasculate[ ] the obvious purpose of the ordinance." *Id.* Under Idaho law, that is, even an express statement of legislative intent to allow severance down to the level of individual phrases will not be given effect if the stricken portions are "integral or indispensable" to the statute as a whole. *See also Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 15 P.3d 1129, 1136–37 (2000) (applying severability clause to strike some sections and retain others under the "integral or indispensable" test); *Simpson v. Cenarrusa*, 130 Idaho 609, 944 P.2d 1372, 1377 (1997) (same); *Clemens v. Pinehurst Water Dist.*, 81 Idaho 213, 339 P.2d 665, 667–68 (1959) (allowing severance where elimination of the unconstitutional language would "still leave the statute complete and operative").

We thus must first consider whether any "section, subsection, sentence, clause, phrase, or word" of the medical-emergency provisions could be stricken without "emasculat[ing]" their obvious purpose. *Boundary Backpackers*, 913 P.2d at 1148. For the same reasons we found the definition of "medical emergency" not susceptible to a narrowing construction, no such severance is possible. Omitting the language that renders the emergency exception unconstitutionally narrow would render the relevant provisions as follows (with the deleted words stricken through):

● The first sentence of section 18–609A(1)(a)(v):

"A medical emergency exists for the minor ~~so urgent that there is insufficient time for the physician to obtain the informed consent of a parent or a court order~~ and the attending physician certifies such in the pregnant minor's medical records."

● Section 18–609A(5)(c):

(i) "Medical emergency" means a ~~sudden and unexpected~~ physical condition which, in the reasonable medical judgment of any ordinarily prudent physician acting under the circumstances and conditions then existing, ~~is abnormal and~~ so complicates the medical condition of the pregnant minor as to necessitate the immediate causing or performing of an abortion:

1. To prevent her death; or

2. Because a delay in causing or performing an abortion will create serious risk of immediate, substantial and irreversible impairment of a major physical bodily function of the patient.

(ii) The term "medical emergency" does not include:

~~1. Any physical condition that would be expected to occur in normal pregnancies of women of simi~~

---

**28.** The clause read:

If any section, subsection, sentence, clause, phrase, or portion of this ordinance is for any reason held invalid or unconstitutional by a federal or state court, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.

*Boundary Backpackers*, 913 P.2d at 1148.

~~lar age, physical condition and gestation; or~~

2. Any condition that is predominantly psychological or psychiatric in nature.

Putting to one side our previously expressed concern that federal courts ought not be redrafting state statutes at the level of individual words, *see Cal. Teachers Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1147 (9th Cir.2001), it is apparent that this rewrite would defeat the obvious purpose of the relevant provisions by removing indispensable qualifications the Idaho legislature intended to put on the circumstances in which emergency abortions could be provided to minors. As discussed at length earlier, the fact that Idaho chose to provide a novel definition, narrower than those given in more than half of its sister states, obligates us to consider what it meant by making that considered choice. The language that would need to be stricken from section 18–609A(1)(a)(v), for example, is indispensable to the legislature's effort to ensure that parental or judicial consent would be secured prior to an abortion wherever it would be possible to do so. This is not merely an incidental feature of the statutory scheme; on the contrary, it is its central purpose, as attested by section 18–602(g)'s declaration that a minor's best interests are "*always* served when there is careful consideration of the rights of parents in rearing their child ..." (emphasis added). Defense of this view of the minor's best interests is the crux of the statute, and the language that would need to be stricken is integral to it.

Since the medical-emergency provision cannot be saved by a narrowing construction or selective invalidation, we must invalidate it altogether. The question, then, is whether the remainder of the statute can still stand.

The answer to that question is clearly "no." Without *any* medical emergency exception, an abortion regulation that could impede a woman's access to a medically necessary abortion is unconstitutional. *Stenberg,* 530 U.S. at 931, 120 S.Ct. 2597; *Lawall I,* 180 F.3d at 1033.

Pursuant to *Casey,* its successors, and Idaho severability law, we conclude that the whole of the statute must therefore be declared invalid. To avoid unnecessary adjudication of difficult constitutional questions, we therefore do not consider whether the various other provisions of the statute that the plaintiffs challenge would be constitutional were the statute to contain an adequate emergency exception.

## III. CONCLUSION

In regulating the performance of abortions on minors, Idaho has acted in pursuit of legitimate interests. The vehicle it has chosen to further those interests, however, fails to provide sufficient access to an abortion for minor women whose life or health necessitate one. We therefore REVERSE the district court as to the sufficiency of the medical-emergency exception and REMAND for entry of the appropriate declaratory relief and injunction against enforcement of the statute.

## APPENDIX: CHALLENGED STATUTORY PROVISIONS

**Idaho Code § 18–605 (2002)**

Unlawful abortions—Procurement of—Penalty.

(1) Every person not licensed or certified to provide health care in Idaho who, except as permitted by this chapter, provides, supplies or administers any medicine, drug or substance to any woman or uses or employs any instrument or other means whatever upon any then-pregnant woman with intent thereby to cause or

perform an abortion shall be guilty of a felony and shall be fined not to exceed five thousand dollars ($5,000) and/or imprisoned in the state prison for not less than two (2) and not more than five (5) years.

(2) Any person licensed or certified to provide health care pursuant to title 54, Idaho Code, and who, except as permitted by the provisions of this chapter, provides, supplies or administers any medicine, drug or substance to any woman or uses or employs any instrument or other means whatever upon any then-pregnant woman with intent to cause or perform an abortion shall:

(a) For the first violation, be subject to professional discipline and be assessed a civil penalty of not less than one thousand dollars ($1,000), payable to the board granting such person's license or certification;

(b) For the second violation, have their license or certification to practice suspended for a period of not less than six (6) months and be assessed a civil penalty of not less than two thousand five hundred dollars ($2,500), payable to the board granting such person's license or certification; and

(c) For each subsequent violation, have their license or certification to practice revoked and be assessed a civil penalty of not less than five thousand dollars ($5,000), payable to the board granting such person's license or certification.

(3) Any person who is licensed or certified to provide health care pursuant to title 54, Idaho Code, and who knowingly violates the provisions of this chapter is guilty of a felony punishable as set forth in subsection (1) of this section, separate from and in addition to the administrative penalties set forth in subsection (2) of this section.

* * *

**Idaho Code 18–609A (2002)**

Consent required for abortions for minors.

(1) (a) No person shall knowingly cause or perform an abortion upon a minor unless:

(i) The attending physician has secured the written informed consent of the minor and the written informed consent of the minor's parent; or

(ii) The minor is emancipated and the attending physician has received written proof of emancipation and the minor's written informed consent; or

(iii) The minor has been granted the right of self-consent to the abortion by court order pursuant to paragraph (b) of this subsection and the attending physician has received the minor's written informed consent; or

(iv) A court has found that the causing or performing of the abortion, despite the absence of informed consent of a parent, is in the best interests of the minor and the court has issued an order, pursuant to paragraph (b)(iv)2. of this subsection, granting permission for the causing or performing of the abortion, and the minor is having the abortion willingly, pursuant to paragraph (f) of this subsection; or

(v) A medical emergency exists for the minor so urgent that there is insufficient time for the physician to obtain the informed consent of a parent or a court order and the attending physician certifies such in the pregnant minor's medical records. In so certifying, the attending physician must include the factual circumstances supporting his professional judgment that a medical emergency existed and the grounds for the determination that there was insufficient time to obtain the informed consent of a parent or a court order. Immediately after an abortion pursuant to this paragraph, the physician shall, with due diligence, at-

tempt to provide a parent of an unemancipated minor actual notification of the medical emergency. If the parent cannot be immediately contacted for such actual notification, the physician shall, with due diligence, attempt to provide actual notification to a parent for an eight (8) hour period following the causing or performing of the abortion and shall, until a parent receives such notification, ensure that the minor's post abortion medical needs are met. Notwithstanding the above, a physician shall, within twenty-four (24) hours of causing or performing an abortion pursuant to this paragraph, provide actual notification of the medical emergency by:

1. Conferring with a parent or agent designated by the parent, and providing any additional information needed for the minor's proper care, and, as soon as practicable thereafter, securing the parent's written acknowledgement of receipt of such notification and information; or

2. Providing such actual notification in written form, addressed to the parent at the usual place of abode of the parent and delivered personally to the parent by the physician or an agent with written acknowledgement of such receipt by the parent returned to the physician; or

3. Providing such actual notification in written form and mailing it by certified mail, addressed to the parent at the usual place of abode of the parent with return receipt requested and restricted delivery to the addressee so that a postal employee can only deliver the notice to the authorized addressee.

For the purposes of this section, "actual notification" includes, but is not limited to, a statement that an abortion was caused or performed, a description of the factual circumstances supporting the physician's judgment that the medical emergency existed and a statement of the grounds for the determination that there was insufficient time to obtain the informed consent of a parent or a court order.

If the physician causing or performing such abortion reasonably believes that the minor is homeless or abandoned so that the parents cannot be readily found or that the minor has suffered abuse or neglect such that the minor's physical safety would be jeopardized if a parent were notified that the abortion was caused or performed, the physician shall, in lieu of notifying a parent as required above, make a report to a law enforcement agency pursuant to section 16–1619, Idaho Code, and a petition shall be filed pursuant to section 16–1605, Idaho Code, which petition shall include a reference to this code section. Upon adjudication that the minor comes within the purview of chapter 16, title 16, Idaho Code, either on the basis of homelessness or abandonment such that no parent can be found, or on the basis of abuse or neglect such that the minor's physical safety would be in jeopardy if a parent were notified that the abortion was performed, the court shall, as a part of the decree, also order that the physician's duty to so notify a parent is relieved. In any other event, unless the court enters a finding that the best interests of the child require withholding notice to a parent, the court shall order that a parent receive actual notification of the medical emergency and the causing or performing of the abortion.

(b) A proceeding for the right of a minor to self-consent to an abortion pursuant to paragraph (a)(iii) of this subsection or for a court order pursuant to

paragraph (a)(iv) of this subsection, may be adjudicated by a court as follows: (i) The petition shall be filed in the county where the minor resides or the county where the abortion is caused or performed. A minor shall have the legal capacity to make and prosecute a petition and appeal as set out herein. A guardian ad litem may assist the minor in preparing her petition and other documents filed pursuant to this section and may seek appointment as set forth below. A guardian ad litem, whether prospective or appointed, must be an attorney properly licensed in this state. The court shall ensure that the minor is given assistance in filing the petition if the minor so desires a guardian ad litem but no qualified guardian ad litem is available.

(ii) The petition shall set forth:

1. The initials of the minor;

2. The age of the minor;

3. The name and address of each parent, guardian, or, if the minor's parents are deceased or the minor is abandoned and no guardian has been appointed, the name and address of any other person standing in loco parentis of the minor;

4. That the minor has been fully informed of the risks and consequences of the abortion procedure to be performed;

5. A claim that the minor is mature, of sound mind and has sufficient intellectual capacity to consent to the abortion for herself;

6. A claim that, if the court does not grant the minor the right to self-consent to the abortion, the court should find that causing or performing the abortion, despite the absence of the consent of a parent, is in the best interest of the minor and give judicial consent to the abortion; and

7. If so desired by the minor, a request that the court appoint a guardian ad litem, or, alternatively, if no guardian ad litem is requested, that the court should consider whether appointment of a guardian ad litem for the minor is appropriate.

The petition shall be signed by the minor and, if she has received assistance from a prospective guardian ad litem in preparing the petition, by the guardian ad litem.

(iii) A hearing on the merits of the petition shall be held as soon as practicable but in no event later than five (5) days from the filing of the petition. The petition shall be heard by a district judge on the record in a closed session of the court. The court shall appoint a qualified guardian ad litem for the minor if one is requested in the petition. If no qualified guardian ad litem is available, the court may appoint some other person to act in the capacity of a guardian ad litem, who shall act to fulfill the purposes of this section and protect the confidentiality and other rights of the minor.

At the hearing, the court shall, after establishing the identity of the minor, hear evidence relating to the emotional development, maturity, intellect and understanding of the minor; the nature of the abortion procedure to be performed and the reasonably foreseeable complications and risks to the minor from such procedure, including those related to future childbearing; the available alternatives to the abortion; the relationship between the minor and her parents; and any other evidence that the court may find relevant in determining whether the minor should be granted the right to self-consent to the abortion or whether the court's consent to causing or performing of the abortion, despite the ab-

sence of consent of a parent, is in the best interests of the minor.

(iv) The order shall be entered as soon as practicable, but in no event later than five (5) days after the conclusion of the hearing. If, by clear and convincing evidence, the court finds the allegations of the petition to be true and sufficient to establish good cause, the court shall:

1. Find the minor sufficiently mature to decide whether to have the abortion and grant the petition and give the minor the right of self-consent to the abortion, setting forth the grounds for so finding; or

2. Find the performance of the abortion, despite the absence of the consent of a parent, is in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding.

If the court does not find the allegations of the petition to be true or if good cause does not appear from the evidence heard, the court shall deny the petition, setting forth the grounds on which the petition is denied.

If, in hearing the petition, the court becomes aware of allegations which, if true, would constitute a violation of any section of title 18, Idaho Code, by a person other than the petitioner, or would bring a child within the purview of chapter 16, title 16, Idaho Code, the court shall order, upon entry of final judgment in the proceeding under this subsection, that an appropriate investigation be initiated or an appropriate information, complaint or petition be filed. Such allegations shall be forwarded by the court with due consideration for the confidentiality of the proceedings under this section. If, but for the requirements for proof as set forth in this section, the minor would have been privileged to withhold information given or evidence produced by her, the answers given or evidence produced and any information directly or indirectly derived from her answers may not be used against the minor in any manner in a criminal case, except that she may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering or failing to answer, or in producing or failing to produce, evidence as required by the court.

(c) A notice of appeal from an order issued under the provisions of this subsection shall be filed within two (2) days from the date of issuance of the order. The record on appeal shall be completed and the appeal shall be perfected as soon as practicable, but in no event later than five (5) days from the filing of notice of appeal. Because time may be of the essence regarding the performance of the abortion, appeals pursuant to this subsection shall receive expedited appellate review.

(d) Except for the time for filing a notice of appeal, a court may enlarge the times set forth pursuant to this subsection upon request of the minor or upon other good cause appearing, with due consideration for the expedited nature of these proceedings.

(e) No filing, appeal or other fees shall be charged for cases or appeals brought pursuant to this section.

(f) If a minor desires an abortion, then she shall be orally informed of, and, if possible, sign the written consent required by this act, in the same manner as an adult person. No abortion shall be caused or performed on any minor against her will, except that an abortion may be performed against the will of a minor pursuant to court order if the abortion is necessary to preserve the life of the minor.

(g) All records contained in court files of judicial proceedings arising under the provisions of this subsection, and subsection (3) of this section, shall be confidential and exempt from disclosure pursuant to section 9–340G, Idaho Code. Dockets and other court records shall be maintained and court proceedings undertaken so that the names of the parties to actions brought pursuant to this section will not be disclosed to the public.

(2) The administrative director of the courts shall compile statistics for each county for each calendar year, accessible to the public, including:

(a) The total number of petitions filed pursuant to paragraph (b) of subsection (1) of this section; and

(b) The number of such petitions filed where a guardian ad litem was requested and the number where a guardian ad litem or other person acting in such capacity was appointed; and

(c) The number of such petitions for which the right to self-consent was granted; and

(d) The number of such petitions for which the court granted its informed consent; and

(e) The number of such petitions which were denied; and

(f) For categories described in paragraphs (c), (d) and (e) of this subsection, the number of appeals taken from the court's order in each category; and

(g) For each of the categories set out in paragraph (f) of this subsection, the number of cases for which the district court's order was affirmed and the number of cases for which the district court's order was reversed.

(3) In addition to any other cause of action arising from statute or otherwise, any person injured by the causing or performing of an abortion on a minor in violation of any of the requirements of paragraph (a) of subsection (1) of this section, shall have a private right of action to recover all damages sustained as a result of such violation, including reasonable attorney's fees if judgment is rendered in favor of the plaintiff.

(4) Statistical records.

(a) The vital statistics unit of the department of health and welfare shall, in addition to other information required pursuant to section 39–261, Idaho Code, require the complete and accurate reporting of information relevant to each abortion performed upon a minor which shall include, at a minimum, the following:

(i) Whether the abortion was performed following the physician's receipt of:

1. The written informed consent of a parent and the minor; or

2. The written informed consent of an emancipated minor for herself; or

3. The written informed consent of a minor for herself pursuant to a court order granting the minor the right to self-consent; or

4. The written informed consent of a court pursuant to an order which includes a finding that the performance of the abortion, despite the absence of the consent of a parent, is in the best interests of the minor; or

5. The professional judgment of the attending physician that the performance of the abortion was immediately necessary due to a medical emergency and there was insufficient time to obtain consent from a parent or a court order.

(ii) If the abortion was performed due to a medical emergency and without consent from a parent or court order, the diagnosis upon which the attending physician determined that the abortion was

immediately necessary due to a medical emergency.

(b) The knowing failure of the attending physician to perform any one (1) or more of the acts required under this subsection is grounds for discipline pursuant to section 54–1814(6), Idaho Code, and shall subject the physician to assessment of a civil penalty of one hundred dollars ($100) for each month or portion thereof that each such failure continues, payable to the center for vital statistics and health policy, but such failure shall not constitute a criminal act.

(5) As used in this section:

(a) "Cause or perform an abortion" means to interrupt or terminate a pregnancy by any surgical or nonsurgical procedure or to induce a miscarriage upon a minor known to be pregnant.

(b) "Emancipated" means any minor who has been married or is in active military service.

(c) (i) "Medical emergency" means a sudden and unexpected physical condition which, in the reasonable medical judgment of any ordinarily prudent physician acting under the circumstances and conditions then existing, is abnormal and so complicates the medical condition of the pregnant minor as to necessitate the immediate causing or performing of an abortion:

1. To prevent her death; or

2. Because a delay in causing or performing an abortion will create serious risk of immediate, substantial and irreversible impairment of a major physical bodily function of the patient.

(ii) The term "medical emergency" does not include:

1. Any physical condition that would be expected to occur in normal pregnancies of women of similar age, physical condition and gestation; or

2. Any condition that is predominantly psychological or psychiatric in nature.

(d) "Minor" means a woman less than eighteen (18) years of age.

(e) "Parent" means one (1) parent of the unemancipated minor, or a guardian appointed pursuant to chapter 5, title 15, Idaho Code, if the minor has one.

* * *

## Idaho Code § 18–614 (2002)

Defenses to prosecution.

(1) No physician shall be subject to criminal or administrative liability for causing or performing an abortion upon a minor in violation of any provision of subsection (1) of section 18–609A, Idaho Code, if prior to causing or performing the abortion the physician obtains either positive identification or other documentary evidence from which a reasonable person would have concluded that the woman seeking the abortion was either an emancipated minor or was not then a minor and if the physician retained, at the time of receiving the evidence, a legible photocopy of such evidence in the physician's office file for the woman. This defense is an affirmative defense that shall be raised by the defendant and is not an element of any crime or administrative violation that must be proved by the state.

(2) If, due to a medical emergency as defined in subsection (5) of section 18–609A, Idaho Code, there was insufficient time for the physician to confirm that the woman, due to her age, did not then come within the provisions of subsection (1) of section 18–609A, Idaho Code, the physician shall not be subject to criminal or administrative liability for performing the abortion in violation of subsection (1)(a)(v) of section 18–609A, Idaho Code, if, as soon as possible but in no event longer than twenty-four (24) hours after performing the abortion, the physician obtained positive identifica-

tion or other documentary evidence from which a reasonable person would have concluded that the woman seeking the abortion was either an emancipated minor or was not then a minor and if the physician retained, at the time of receiving the evidence, a legible photocopy of such evidence in the physician's office file for the woman. This defense is an affirmative defense that shall be raised by the defendant and is not an element of any crime or administrative violation that must be proved by the state.

(3) If after performing an abortion under circumstances of a medical emergency as defined in subsection (5) of section 18–609A, Idaho Code, the physician, after reasonable inquiry, is unable to determine whether or not the woman is a minor, the physician shall not be subject to criminal, civil or administrative liability for taking any action that would have been required by subsection (1)(a)(v) of section 18–609A, Idaho Code, if the woman had been a minor at the time the abortion was caused or performed.

(4) For purposes of this section, "positive identification" means a lawfully issued state, district, territorial, possession, provincial, national or other equivalent government driver's license, identification card or military card, bearing the person's photograph and date of birth, the person's valid passport or a certified copy of the person's birth certificate.

\* \* \*

**Idaho Code § 18–615 (2002)**

Severability.

If any one (1) or more provision, section, subsection, sentence, clause, phrase, or word of this chapter or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this chapter shall remain effective notwithstanding such unconstitutionality. The legislature hereby declares that it would have passed every section of this chapter and each provision, section, subsection, sentence, clause, phrase or word thereof irrespective of the fact that any one (1) or more provision, section, subsection, sentence, clause, phrase or word be declared unconstitutional.